STACY TEBO,

             **Plaintiff,**

v.                                         **Case No:  6:16-cv-1599-Orl-31DCI**

**CITY OF DEBARY, FLORIDA and LEO DANIEL PARROTT**

             **Defendants.**

_____

## ORDER

This matter comes before the Court without a hearing on the Motion for Summary Judgment (Doc. 29) filed by the Defendants, City of Debary, Florida (the "**City**") and Leo Parrot ("**Parrot**"), the response in opposition (Doc. 35) filed by the Plaintiff, Stacy Tebo ("**Tebo**"), the reply (Doc. 36) filed by the City and Parrot, and the surreply (Doc. 41) filed by Tebo.

## BACKGROUND[1]

### I.    Tebo's Employment

On April 11, 2005, the City hired Tebo as the City Clerk. (Doc. 44, p. 10). As the City Clerk, Tebo performed numerous duties, including administrative tasks for the City Manager and City Council. (*See* Doc. 35-10, p. 1). Initially, Tebo was supervised by the City's Finance Director, James Sealbinder ("**Sealbinder**"). (Doc. 44, p. 10). But, in 2010 the City hired Parrot as the City Manager

---

[1] Though Tebo responds to Defendants' statement of material facts, she does not offer her own recitation of facts. (*See* Doc. 29). Therefore, the Background is largely taken from the Amended Complaint (Doc. 12), the joint pretrial statement (Doc. 44), the parties' briefs (Docs. 29, 35, 36, 41), and supporting evidentiary documents. Unless otherwise indicated, the facts are construed in the light most favorable to Tebo. The Background should not be construed as factual findings of the Court.

and he became Tebo's direct supervisor. (Doc. 44, p. 10.) Tebo worked under Parrot's supervision until her termination on May 17, 2015. (*Id.*).

## II.     Tebo's Complaints to City Council

Prior to Tebo's termination, Parrot subjected her to ongoing and pervasive sexist remarks. (Doc. 12, ¶¶ 1, 12). For example, in 2013, when Sealbinder was about to retire, Parrott said, "I'm not going to hire a woman because we got too much estrogen upstairs. . . . We need to hire a man. You guys are too emotional."[2] (Doc. 29-5, p. 45). On an unspecified date, Parrot told Tebo and the Assistant City Manager, Kassandra Blissett ("**Blissett**"), "you know, you guys are just bitches, and that's why everybody downstairs hates working here." (*Id.* at 68). In 2014, Tebo overheard a conversation between Parrot and Blissett, wherein Parrot remarked, "you're like the county whore, always running around the county." (*Id.* at 71). In addition to those statements, Parrot: (1) called Tebo "emotional on multiple occasions" (*id.* at 65); (2) referred to women as being "catty" (*id.*); and (3) made comments about women "bitching" at least ten times (*id.* 68). In early 2013, Tebo complained about Parrot's sexist comments and his performance as City Manager to her long-time friends—City Councilman Dan Hunt ("**Hunt**") and Chris Carson ("**Carson**"). (*Id.* at 6; Doc. 29-4, pp. 21–22). Tebo also claims that she complained to Parrott about his comments on "numerous occasions" to no avail. (Doc. 35-1, p. 5).

In or about December 2013, Tebo noticed that one of the City's proposed resolutions did not contain her name "as it always had to attest the Mayor's signature." (Doc. 35, p. 8). Instead, the resolution contained the name of the Planning Administrator, Rebecca Hammock ("**Hammock**"). (*Id.*). Fearing that her job might be in jeopardy, Tebo confronted Parrot. (*Id.*). When confronted, Parrot told Tebo not to "get paranoid" and explained that the person who prepared the resolution

---

[2] Parrot ultimately replaced Sealbinder with a woman. (Doc. 29-5, p. 45).

had simply made a mistake. (*Id.*). Doubting Parrot's explanation, Tebo complained to Councilman Nick Koval ("**Koval**") about the issue. (*Id.*; Doc. 29-4, p. 22; Koval Aff., Doc. 35-3, pp. 2–3). When Koval called the City attorney to inquire why the resolution did not contain Tebo's name, the City attorney stated that Parrot had instructed his office to make the change. (Doc. 35-3, p. 3). But, when Koval called Parrot, he maintained that one of the girls at the City attorney's office had "messed [the resolution] up." (*Id.*). Koval told Parrot that "it better be a mistake[,] and nothing better happen to [Tebo]." (*Id.*).

Sometime thereafter, several sources informed Parrot that Tebo had been complaining about him to City Council. (Doc. 29-2, pp. 78–79). Councilman Carson advised Parrot that Tebo had complained that he was a sexist because he would not authorize an assistant position for her. (*Id.* at 78, 136). Councilman Hunt informed Parrot that Tebo had complained that he was sexist and that he was making mistakes as the City Manager. (*Id.* at 78–79, 136–137). Blissett reported to Parrott that she "had been approached by several members of Council" about Tebo complaining to them out of "frustration." (Blissett Dep., Doc. 29-3, pp. 70). As discussed in further detail below,[3] Parrott confronted Tebo about her a lack of loyalty and instructed her to desist from complaining about him to City Council. (Doc. 29-4, pp. 22, 25–26; Doc. 29-3, p. 71).

### III. Tebo's Involvement with Kabbas' Complaint of Sexual Harassment

In October 2013, Kendra Kabbas ("**Kabbas**"), an administrative assistant to Parks and Recreation Director John Fletcher ("**Fletcher**"), notified the City that she would be resigning from her position in January 2014. (Kabbas Aff., Doc. 35-14, p. 2). Tebo provided Kabbas with an Employee Exit Interview form ("**Interview Form**") and asked her to complete it upon her resignation. (*Id.*).

---

[3] *See* Background, Section IV.

Kabbas resigned from her position on January 10, 2014. (*Id.*). That evening, Kabbas, Tebo, and their co-worker, Annette Hatch ("**Hatch**"), met at a restaurant. (*Id.*). While at the restaurant, Kabbas told Tebo and Hatch about an incident that occurred between herself and Fletcher. (*Id.*). Specifically, Kabbas told them that "one day while [she] was preparing to leave work[,] [Fletcher] had come out to the front desk where [she] was working and . . . said, "[b]etween you and me. I want to thank you for wearing that boobie shirt today." (*Id.*). The following week, Tebo asked Hatch and Hammock "if they had ever heard Fletcher say anything inappropriate." (*Id.*). Both women responded in the negative. (*Id.*).

On or about January 29, 2014, Kabbas returned to the office to give Tebo her completed Interview Form. (Doc. 35-14, p. 3). On the Interview Form, Kabbas stated that she had a "good work experience" but "some inappropriate comments made by supervisors did make it uncomfortable sometimes, (i.e. comments about cleavage, sexiness)." (Doc. 29-1, pp. 35–36, ¶¶ 12 ("**Interview Form**")). Tebo forwarded the Interview Form to Parrot. (Doc. 29-5, p. 49). Tebo claims that when she gave Parrot the Interview Form, she told him that she had already interviewed Hammock and Hatch but they had nothing to report.[4] (Doc 35-22, p. 1).

After reviewing the Interview Form, Parrot told Tebo that Kabbas' complaint was too vague, as she had failed to identify the supervisor(s) who made the inappropriate comments.[5] (Doc. 29-4, p. 48; Doc. 29-2, p. 73). Tebo asked Parrot if he wanted her to call Kabbas to get further information, but Parrot "emphatically forbade [Tebo] to contact [Kabbas]." (Doc. 29-1, p. 27). Parrot told Tebo

---

[4] As discussed below, Parrot claims that Tebo did not disclose her interviews with Hammock and Hatch. (Doc. 35-22, p. 1).

[5] There is no indication that Tebo told Parrot about the conversation she had with Kabbas on January 10, 2014, or that she told Parrot that she knew which supervisor Kabbas was referring to on the Interview Form.

that it was his responsibility to investigate claims of sexual harassment and her involvement in the situation was over. (*Id.*; Doc. 29-4, p. 25).

In February 2014, Kabbas came to Tebo's office to pick up paperwork required by her new employer. (Doc. 35-14, p. 3; Doc. 29-5, p. 49). While collecting the paperwork, Kabbas inquired whether anything had been done about her complaint. (Doc. 35-14, p. 3; Doc. 29-4, pp. 24–25). When Tebo told Kabbas that Parrot did not think her complaint was specific enough, Kabbas asked Tebo for the Interview Form. (Doc. 35-14, p. 3). Kabbas then amended the Interview Form by describing the inappropriate comment that Fletcher had allegedly made to her. (*See* Doc. 29-1, p. 37). Tebo scanned Kabbas' amended Interview Form and sent it to Parrott. (Doc. 29-4, 49).

Parrot assigned Blissett the responsibility of investigating Kabbas' complaint but admits that he never contacted Kabbas. [6] (Doc. 29-2, p. 73; Doc. 29-2, p. 73). On Monday, February 17, 2014, Blissett scheduled a meeting with Fletcher and he denied Kabbas' accusations. (*Id.*). Then, on March 6, 2014, Parrot conducted an investigation[7] and asked "all the females who worked . . . around . . . Kabbas and . . . Fletcher, . . . if they had heard or seen anything . . . inappropriate." (Doc. 29-2, 73–74, 151). Parrot found no proof of misconduct on Fletcher's part. (*Id.* at 74, 151). But, during the interviews, Hatch told Parrot that when Tebo asked her about this, she felt as though Tebo was trying to pressure her into claiming that Fletcher had made inappropriate comments. (Doc. 29-2, p. 67, 74; Doc. 29-1, pp. 40–47). Parrot claims that this was the first time he learned that Tebo had already spoken with Hammock and Hatch. (Doc. 35-22, p. 1).

---

[6] Tebo admits that she does not know what, if anything, Parrott did after receiving Kabbas' amended Interview Form. (Doc. 29-5, pp. 50–51).

[7] In an affidavit, Blissett acknowledges that Parrot conducted an investigation by interviewing four employees: Hatch, Hammock, Fletcher, and Alan Williamson. (Doc. 35-13, p. 2). But, Blissett claims that the primary reason for Parrot's investigation was to look "into complaint(s) he may have received about that [Tebo] being unfriendly to fellow City staff." (*Id.*).

Once the interviews concluded, Parrot revoked Tebo's human resources ("**HR**") responsibilities and reassigned them to Blissett. (Doc. 29-2, pp. 66–67; Doc. 29-1, p. 48).

## IV.    Tebo's 2014 Performance Evaluation

Between 2011 and 2014, Parrot assessed Tebo's work performance using a standardized Employee Performance Evaluation form. Each form contained six performance categories—"Knowledge of Work", "Productivity", "Quality of Work", "Work Habits", "Dependability", and "Employee/Public Relations—for which Parrot was required to assign Tebo one of three ratings—Below Expectations", "Meets Expectations", or "Exceeds Expectations." (*See e.g.*, Doc. 29-1, pp. 8–10). In 2011, 2012, and 2013, Parrot gave Tebo a rating of Exceeds Expectations in all performance categories. (*Id.* at 8–18). But, in his draft of Tebo's 2014 evaluation, Parrot assigned her a rating of Meets Expectations in Productivity, Dependability and Employee/Public Relations. (Doc. 35-11, pp. 2–5 ("**2014 Evaluation**")). He gave Tebo a rating of Exceeds Expectations in the remaining three categories. (*Id*).

For the performances areas in which Parrot gave Tebo a rating of Meets Expectations, he made the following comments:

| 2. Productivity<br>Meeting Goals & Objectives<br>Meeting Work Schedule<br>Volume of Work<br>Initiative/Resourcefulness | Below Expectations<br>Work volume does not meet job requirements. Fails to meet work schedules or make adequate progress toward goals and objectives. Lacks initiative to meet schedules or to perform without prompting | Meets Expectations<br>Makes productive use of time in completing work tasks; meets most goals and work schedules. Work tasks are accomplished.<br>X | Exceeds Expectations<br>Very industrious; meets all goals and work schedules. Uses initiative to exceed work demands. |
|---|---|---|---|

Comments/Explanation    Responsibilities have been reduced by reassigning responsibility for HR function causing increased work load on others Uses time effectively to accomplish remaining responsibilities.

| 5. Dependability | Below Expectations | Meets Expectations | Exceeds Expectations |
|---|---|---|---|
| Follows Directions<br>Accepts Responsibility<br>Judgement<br>Decision making | Often fails to carry out assignments and complete work tasks promptly. Cannot be relied on to exercise good judgement or make sound decisions in order to Accomplish job responsibilities. | Follows supervisor's directions, and exercises good judgement. Can always be relied upon to complete work assignments timely with little supervision. Makes sound decisions and willingly accepts responsibility. | Unusual sense of responsibility and dependability.<br><br>Readily accepts directions and uses strong initiative to anticipate problems and proposes creative ideas. |
| | | X | |

Comments/Explanation _____ Typically follows direction, although not always without complaint. At times expresses dissatisfaction and critique o other employees to individual council members.

Stacy does exhibit a strong initiative to anticipate problems and propose solutions. Shows concern for the organization.

| 6 Employee/Public Relations | Below Expectations | Meets Expectations | Exceeds Expectations |
|---|---|---|---|
| With Public<br>With Supervision<br>With Employees<br>Attitude Toward Job | Has difficulty working with others. May resist supervision and lack customer service attitude when dealing with the public. Has little enthusiasm for job and overly critical of the agency. | Works well with employees and the public. Accepts supervision and shows interest in work. Promotes the City and its interests. | Actively cooperates with supervision. Goes out of way to assist others. Exhibits an Extremely positive attitude Toward work and the City. Accepts criticism and is a strong force in group morale. |
| | | X | |

Comments/Explanation _____ Stacy works well with the public and did an exceptional job in working with council candidates during the most recen contentious election cycle. , however there has been noticeable tension in dealing with other employees.

At Tebo's request, Blissett and Parrot met with her on November 20, 2014, to discuss her proposed 2014 Evaluation. (Doc. 35-11, p. 1; Doc. 35-1, p. 12). During the meeting, Tebo told Parrot that she deserved high ratings in every performance category and that she did not appreciate some of the comments he made in his draft of the 2014 Evaluation. (Doc. 35-1, p. 12). Parrot responded by voicing his displeasure with Tebo complaining about him to City Council. (*Id.*). In reply, Tebo told Parrott that he was "paranoid" and that he "assumed way too much." (*Id.*). Parrott then warned Tebo that he could fire her whenever he wanted and demanded that she stop complaining about him to City Council. (*Id.*).

A few weeks later, Parrot modified Tebo's 2014 Evaluation by giving her a rating of Exceeds Expectations in all performance categories and removing the comments Tebo did not like. (Doc. 29-1, 4–7 (finalized 2014 Evaluation)).

## V. The City's Compensation Plan

In 2014, the City conducted a pay study to address high turnover and to determine the relative competitive position of the City's pay structure. (Doc. 29-1, p. 51). The study was performed by an outside firm, Burris & Associates. (*Id.*). Donald Burris ("**Burris**"), the managing partner of Burris & Associates, worked with Parrot and Blissett on the design and development of pay structures, and the implementation of the proposed compensation plan. (*Id.* at 58). Based on a survey of the labor market, Burris designed and developed two separate pay structures for the two work groups involved: the maintenance/hourly work group and the administrative/salaried work group. (*Id.* at 58).

For the maintenance work group, Burris suggested a pay structure utilizing a traditional step progression plan. (*Id.*). For the administrative group, Burris initially suggested a pay structure with an eighty percent salary range. (*Id.* at 59). Parrott did not think the proposed salary range would be acceptable to City Council because it was too broad. (*Id.* at 59; Doc. 29-2, p. 39). Thus, Parrott suggested using a step progression plan for the salaried positions. (Doc. 29-1, p. 59). Based on Burris's professional experience, he agreed that step progression was appropriate for the salaried positions. (*Id.* at 59). Therefore, Burris worked with Parrot to create a step progression compensation plan. (Doc. 29-2, p. 40–41; Doc. 29-3, pp. 63–64).

Tebo claims that Parrot manipulated the compensation plan by placing her position at a pay grade 20 rather than a pay grade 22, which was lower than any of the other department heads. [8] [9]

---

[8] Tebo acknowledged that there were no pay grades prior to the pay study. (Doc. 29-5, p. 96).

[9] Parrot testified that Burris "developed and submitted" the paygrade assigned to Tebo. (Doc. 29-2, p. 100). According Burris, "the City Clerk position, (then held by Stacy Tebo), was placed at Grade 20, as that was the midpoint of the salary survey results for City Clerks in the competitive labor market." (Doc. 29-1, p. 59).

(Doc. 29-4, p. 19; Doc. 29-3, p. 64). When the compensation plan went into effect in January 2015, all employees received some form of a pay increase. (Doc. 29-4, p. 19; Doc. 29-1, p. 66). Female employees received an average pay raise of 2.13% while the male employee received an average pay raise of 12.54%. (Doc. 29-1, p. 66). Tebo received a pay raise of 1.08%. (*Id.*).

## VI.    Tebo's Informal Complaint

On Friday, March 6, 2015, Blissett filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("**EEOC**"), asserting that Parrot had subjected her to "unequal pay" and unlawful "employment practices" based on her gender. (Doc. 35-15). The following Monday, Parrot informed Blissett that he was eliminating her position due to budget cuts. (Doc. 29-3, pp. 49, 78, 85; Doc. 29-2, p. 110). After Parrot laid Blissett off, Tebo began encouraging other to women file complaints with the EEOC. (Doc. 29-4, p. 30). In addition, Tebo hand-delivered a letter to Parrot on March 16, 2015, claiming that he had, *inter alia*, discriminated against her because of her gender. (*See* Doc. 29-1, p. 67 ("**Informal Complaint**")).

## VII.   Maguire's Records Request

During the week of March 9, 2015, City resident Barry Maguire ("**Maguire**"), made a public records request for Parrott's emails. (Maguire Aff., Doc. 35-4; Doc. 29-5, pp. 34–35). Tebo tried to send Maguire the emails on Friday, March 13, 2015, but they were rejected by Maguire's email service provider. (Doc. 29-5, pp. 34–35; Doc. 35-6). After speaking with the City's IT consultant, Eric Frankton ("**Frankton**"), Tebo split up the emails and started sending them to Maguire piecemeal. (Doc. 29-5, 34–35; Doc. 35-6).

On March 17, Parrot requested that Tebo provide him with him all the emails that she sent to Maguire. (Doc. 35-22, p. 5; Doc. 29-2, p. 180). A week later, Tebo sent Parrot four separate emails containing 101 attachments, but Parrot was skeptical that Tebo had sent him everything.

(Doc. 29-1, p. 19; Doc. 29-2, p. 179). Consequently, Parrot asked Frankton to access the City's "Barracuda audit log" and to print a copy of what Tebo had sent and when she sent it. (Doc. 29-2, p. 179). Parrot then compared the emails that Tebo provided to him with those she sent to Maguire. (*Id.* at 181–182). According to Parrot, "there were some significant differences"; "a lot of emails and attachments were missing." (Doc. 29-2, p. 181). Tebo had sent emails to Maguire on March 13th, March 17th, March 19th, and March 20th, with a total of 131 attachments. (Doc. 29-1, p. 19; Doc. 29-2, pp. 179–180). Thus, Parrot concluded that Tebo had made a deliberate attempt to "sanitize" the emails she chose to send him. (Doc. 29-1, p. 19; Doc. 29-2, pp. 182– 183).

Tebo claims that Parrot was "mistaken" in his belief that she sent emails to Maguire on the abovementioned dates and that Parrot had "neglected to discern the difference between [her] sending emails directly from the archiver (which were never actually sent and received) and [her] sending emails directly from" her City email account. (Doc. 29-1, p. 25). Tebo admits that she did get "confused as to what [she] had sent . . . what [she] hadn't sent, and what [she] . . . forwarded," but she asserts that she provided Parrot with a complete set of emails. (Doc. 29-5, pp. 39–41; Doc. 29-1, p. 24–25).

## VIII. Tebo's Discussion with the Mayor

On the evening of March 18, 2015, Tebo went to the office of Mayor Clint Johnson (the "**Mayor**") to inform him that she was leaving work for the night. (Doc. 29-5, p. 78). At that time, the Mayor asked Tebo how to gain access to the City's message archiver because he wanted to know what happened between Blissett and Parrot. (*Id.* at 78). While explaining how the archiver worked, Tebo advised the Mayor that the archiver was supposed to capture everything that came in but that "there was . . . one e-mail that [she] knew had an attachment, and [she] couldn't find [it] . . . so [she] [did]n't . . . ha[ve ]total faith in [the archiver]." (*Id.* at 78–79). The Mayor then asked

Tebo how she thought the other members of City Council would vote on Parrot's termination. (*Id.*). Tebo responded that she did not know how City Council would vote but that Councilwoman Lita Handy-Peters was always supportive of Parrot. (*Id.* at 79). When the Mayor asked Tebo how she thought Councilman Carson would vote, Tebo responded that she did not know. (*Id.*).

On March 19, 2015, the Mayor told Parrot that Tebo had approached him in his office, raised the topic of terminating him, and discussed how members of City Council might vote. (Doc. 29-2, p. 128). The Mayor also told Parrot that Tebo had: (1) inappropriately accessed emails belonging to Parrot and other members of City Council to look for unflattering information; and (2) accused Parrot of erasing an email that she could not find. (*Id.* at 128–130, 132, 175). That evening, Parrot sent Tebo an email, notifying her that she would no longer serve as custodian of records ("**COR**") for the City. Specifically, Parrot wrote in pertinent part:

> It has recently come to my attention that you have been accessing my Email correspondence and the Mayor's and council members' email correspondence through the City of Debary's computer system. In your position as the City Clerk and pursuant to the City's Charter your duties and responsibilities do not entail the activities that you are engaging in in terms of searching and obtaining my email correspondence and/or the email correspondence of the Mayor or of council members. Furthermore, as you know, you and former Assistant City Manager, Kassandra Blissett, have recently filed charges of gender discrimination with the EEOC against the City of Debary. In light of the charges of discrimination that have been filed and in light of the fact that my emails and the Mayor's and council members' emails are public records, there is a litigation hold now being put in place as to the emails that you have recently been accessing outside of your prescribed duties and responsibilities. Effective immediately your access to any emails within the City of Debary's computer system, other than your own email account, has been disabled. In addition, effective immediately, you are no longer the records custodian for the City's records.

(Doc. 35-5, p. 1).

In response to Parrot's email, Tebo denied inappropriately accessing any emails. (*Id.* at 2). Tebo advised Parrot that she had responded to several records requests during the past two weeks and requested that Parrot provide more details regarding her purported misuse of the City's computer system (*e.g.*, the dates she accessed the emails and the subject of the emails). (*Id.*).

## IX.    Parrot's Appointment as City Clerk

On April 1, 2015, Councilman Rick Dwyer ("**Dwyer**") motioned to appoint the Parrot as City Clerk in accordance with the City Charter. (Doc. 35-18, p. 3; Doc. 29-2, p. 153). Councilwoman Handy-Peters seconded, and the motion passed unanimously. (Doc. 35-18, p. 3). The following day, Tebo telephoned Dwyer to inquire why he motioned to appoint Parrot as City Clerk. (Doc. 29-5, p. 76). When Dwyer responded that he could not answer because the matter was addressed in executive session, Tebo allegedly discontinued the call. (*Id.* at 75–76.)

Soon thereafter, Councilman Dwyer allegedly emailed Parrot and told him that Tebo had called and attempted to discuss the reason for his motion. (Doc. 29-5, p 185–186). Dwyer also told Parrot that when he told Tebo that he could not discuss the issue, she became insistent on trying to get information out of him and it made him feel uncomfortable. (*Id.*).

## X.    Tebo's Termination and Charge of Discrimination

By letter dated April 17, 2015, Parrot notified Tebo that he was terminating her employment effective May 17, 2015. (Doc. 29-1, pp. 19–21 ("**Termination Letter**"). Between April 17, 2015 and May 17, 2015, Tebo was suspended with pay. (Doc. 29-5, p. 18; Doc. 29-2, p. 174). As grounds for her termination, the Termination Letter stated that Tebo had violated several provisions of Personnel Policy by:

1. failing to fully comply with Parrot's request to him send all the emails she sent to Maguire;

2. approaching the Mayor and holding an inappropriate discussion wherein she:

     a. expressed her opinion on how each Council member would vote to terminate the Parrot;

     b. expressed that she could convince Councilman Carson to vote to terminate Parrot;

     c. acknowledged that she had inappropriately searched Parrot's emails;

     d. opined that Parrot had erased an email that she could not find;

     e. untruthfully stated that Parrot had previously attempted to fire her, but City Council prevented it;

3. failing to tell Parrot that she investigated Kabbas' complaint and by attempting to inappropriately influence Hatch to make negative comments about Fletcher; and

4. telephoning Councilman Dwyer and attempting to discuss and determine the reason for his motion to appoint Parrot as City Clerk.

(*Id.*). A week later, Parrot sent Tebo an addendum to the Termination Letter, stating that she was also being terminating because she had violated Personnel Policy by creating an unauthorized and private email address to send and receive correspondence on the City's behalf. (Doc. 29-1, pp. 22–23 ("**Addendum**")).

Perceiving her rights to have been violated, Tebo filed an official charge of discrimination with the EEOC and the Florida Commission on Human Relations, claiming that Parrot had discriminated and retaliated against her in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000, *et seq.* ("**Title VII**") and the Florida Civil Rights Act, Fla. Stat. § 760.01, *et seq.* ("**FCRA**"), and the Equal Pay Act. (Doc. 29-1, p. 69; Doc. 35-7).

## XI. The Instant Suit

After exhausting her administrative remedies, Tebo timely initiated the instant action against the City and Parrot ("**Defendants**"). (Doc. 1). In an Amended Complaint, Tebo asserts Title VII and

FCRA[10] claims against the City for sex discrimination and retaliation. (Doc. 12, ¶¶ 25–32). In addition, Tebo asserts a 42 U.S.C. 1983 ("**Section 1983**") claim against Parrot for "unequal treatment." (*Id.* ¶¶ 33–39).[11] Defendants now move for summary judgment, arguing that Tebo was terminated for insubordination and acts of disloyalty. (Doc. 29). Tebo opposes their motion. (Doc. 35).

## LEGAL STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys*, 941, F.2d 1428, 1438 (11th Cir. 1991)). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable

---

[10] Florida courts have held that decisions construing Title VII are applicable when considering claims under the FCRA. *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998). As such, the Court will not separately discuss Tebo's FCRA claims.

[11] The Court notes that Tebo does not assert a claim under the Equal Pay Act. (*See* Doc. 12, ¶ 3).

inferences drawn from the evidence in the light most favorable to the nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, the non-moving party must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

**ANALYSIS**

## I. Sex Discrimination Claims (Counts I and III)

### A. Disparate Treatment

In Counts I and III, Tebo asserts that the City terminated her because of her gender.[12] (Doc. 35, p. 14). Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" that individual's gender. 42 U.S.C. § 2000e-2(a)(1). A plaintiff in a Title VII case may prove disparate treatment through direct or circumstantial evidence. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008). Whereas here, a plaintiff presents no direct evidence of discrimination and instead relies on circumstantial evidence to prove discriminatory intent, courts employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

Under this framework, the plaintiff must first establish a prima facie case of discrimination. *Id.* at 802. Once established, the defendant then must come forward with evidence that articulates

---

[12] To the extent Tebo intends to assert a Title VII claim for unequal pay, that claim fails because Tebo fails produce any evidence showing that the City paid similarly-situated male employees more than her.

some legitimate, nondiscriminatory reason for the adverse employment action "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). If the defendant articulates a legitimate, nondiscriminatory reason for its actions, the plaintiff must then show that the defendant's alleged reason is pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 802–04.

For purposes of resolving this motion, the Court assumes, without deciding, that Tebo can establish a prima facie case of discrimination. Thus, the burden shifts to the City to articulate a legitimate, non-discriminatory reason for terminating her. For its part, the City asserts that it terminated Tebo due to her "insubordination" and "acts of disloyalty" set forth in the Termination Letter and the Addendum. (Doc. 29, p. 3; Doc. 29-1, pp. 19–21). The Court finds that the City has proffered legitimate, nondiscriminatory reasons for terminating Tebo. Therefore, Tebo must demonstrate that that the City's articulated reasons are mere pretext for discrimination.

At the pretext stage, Tebo must "cast sufficient doubt on the [City's] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct." *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (citation omitted). To do so, Tebo may point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the City's proffered explanations. *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, Ala., 446 F.3d 1160, 1163 (11th Cir. 2006).

A reason is not pretextual "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Hicks*, 509 U.S. at 515. Furthermore, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality

as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.,* 610 F.3d 1253, 1266 (11th Cir. 2010). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Rather than clearly identifying her pretext arguments in a discrete section of her brief, Tebo sprinkles her arguments throughout the first fifteen pages of her brief. It is not the Court's job, especially in a counseled case, to trove a party's brief in search of arguments supporting their claim. *Smith v. Sec'y, Dep't of Corr.*, 572 F.3d 1327, 1352 (11th Cir. 2009). Nonetheless, the Court has attempted to ferret out Tebo's pretext arguments and concludes that she fails rebut each of the City's proffered reasons for terminating her employment.

Tebo argues that the City's first proffered reason her termination (her alleged failure to send Parrot all the emails she sent to Maguire) is pretext for discrimination because Parrot failed to retain his notes from his comparison of the emails sent by Tebo. (Doc. 35, p. 6). The Court is unpersuaded. Even if Parrot failed to retain his notes,[13] this evidence would not rebut Parrot's testimony that he conducted a comparison of the emails Tebo sent. Nor does it call into question Parrot's belief that Tebo made a deliberate attempt to withhold some of the emails. Moreover, any evidence of Parrot's purported failure to retain his notes would be insufficient to generate material issues as to whether Parrot discriminated based on Tebo's gender. Any negative inference that could be drawn from the lack of notes would spring from pure speculation and could not defeat the summary judgment motion. As such, Tebo has failed to rebut the City's first proffered reason for her termination.

---

[13] When asked whether he kept his notes comparing the emails Tebo sent, Parrot testified that he did not remember. (Doc. 29-2, pp. 181–182 ("They are probably still somewhere. But I don't know where they are at. Probably with that March 19th memo.").

Likewise, Tebo has failed rebut the City's assertion that it terminated her due to her discussions with the Mayor regarding, *inter alia*, how City Council would vote to terminate Parrot. In fact, Tebo admits that she discussed how members of Council would potentially vote with respect to Parrot's termination. (Doc. 29-5, pp. 78–80). She simply claims it was the Mayor who raised the issue, not her. (*Id.*). However, whether the Mayor or Tebo raised the issue is immaterial. The question is whether Parrott honestly believed the Mayor's report. *Clark v. S. Broward Hosp. Dist.*, 601 F. App'x 886, 896 (11th Cir. 2015) ("Significantly, the question is not whether [the] [p]laintiff actually engaged in the alleged misconduct. Rather it is whether the [defendant] in good faith believe the reports of misconduct.").

Parrot testified that when he assessed the situation, he "thought the [Mayor] was telling [him] the truth." (Doc. 29-2, 134–135). Furthermore, Parrot confirmed the Mayor's report when the Mayor reviewed the language contained in Tebo's Termination Letter. (*Id.* at 135–136). Tebo argues that "a jury can reasonably conclude that Parrott had no reasonable belief that she would have said such things to the Mayor because she barely knew him. (*Id.*). But, such an inference would result from sheer surmise or conjecture. (Doc. 29-4, pp. 21–23; Doc. 35-1, p. 14). Tebo offers no evidence tending to show that Parrot did not honestly believe the Mayor's report. Nor does she offer evidence showing that Parrott's belief in the Mayor's report was unreasonable. As such, Tebo has also failed to rebut this basis for her termination.

Having found that Tebo has failed to rebut at least two of the City's legitimate, non-discriminatory reasons for her termination, the Court need not reach the other City's other reasons. Tebo simply cannot survive summary judgment on her claim for discriminatory discharge. *See Crawford v. City of Fairburn, Ga.*, 482 F.3d 1305, 1308 (11th Cir. 2007) ("If the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to

survive a motion for summary judgment.").[14] [15]

### B. Hostile Work Environment

As part of her claim for sex discrimination, Tebo also asserts that the City subjected her to a hostile work environment. (Doc. 12, ¶¶ 25, 29). It is not entirely clear what harassment Tebo claims she suffered that created a hostile work environment. But, based upon the facts presented in Tebo's response, she presumably argues that she was subjected to a hostile work environment due to Parrot's: (1) alleged sexist remarks; (2) his draft of her 2014 Evaluation; and (3) his admonition that he could fire her whenever he wanted. (*See* Doc. 35, pp. 8–9).

To establish a claim for hostile work environment discrimination Tebo must show: (1) she belongs to a protected group, (2) she has been subject to unwelcome harassment; (3) the harassment was based upon her sex; (4) the harassment "was sufficiently severe or pervasive to alter the terms and conditions of [her] employment and create a discriminatorily abusive working environment;" and (5) the City is responsible for such an environment. *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1248–49 (11th Cir. 2014) (citation omitted). The City challenges only the fourth element.

---

[14] Relying on *Goldsmith v. Bagby Elevator Co., Inc*., 513 F.3d 1261 (11th Cir. 2008), Tebo contends that because Parrot laid Blissett off a few days after she filed a complaint with the EEOC, this "me too" evidence is sufficient to "rebut [the] City's defenses." (Doc. 35, p. 13). The Court disagrees. In *Goldsmith*, the Eleventh Circuit generally approved of the use of "me too" evidence under Fed. R. Evid. 404(b), where that evidence was offered to support a pattern and practice claim and to rebut certain defenses. 513 F.3d at 1285. Here, Tebo fails to explain how, if at all, her "me too" evidence rebuts each of the City's legitimate non-discriminatory reasons for her termination. Moreover, and upon review of the record, the Court finds that it doesn't. As such, Tebo's "me too" evidence does not preclude summary judgment. *See Jackson v. United Parcel Serv., Inc.*, 593 F. App'x 871, 877 (11th Cir. 2014) (affirming district court's order granting summary judgment where none of the plaintiff's "me too" evidence rebutted the defendant's legitimate non-discriminatory reasons for failing to promote the plaintiff.)

[15] Tebo has not argued that there is a "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by [Parrot]." *Smith v. Lockheed–Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011) (citations omitted). To be sure, the Court notes that Tebo's brief only references the burden-shifting framework set forth in *McDonnel Douglas*. (*See* Doc. 35, pp. 14–19; *see also* Doc. 44, pp. 10–11).

The fourth element contains both a subjective and an objective component. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (en banc). Tebo must "subjectively perceive the harassment as severe or pervasive enough to change the terms or conditions of employment, and [her] subjective perception must be objectively reasonable." *Reeves*, 594 F.3d at 809 (citations omitted). The Court presumes, based on her allegations, that Tebo subjectively found her working environment to be abusive. However, the Court does not find that Tebo's work environment was objectively hostile.

In considering whether the alleged harassment is objectively severe, courts consider, *inter alia*: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller*, 277 F.3d at 1276; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997). Here, Tebo does not adduce evidence showing that Parrot's alleged sexist remarks—or any of his other conduct—occurred on a frequent basis. In fact, based on the evidentiary record it appears that any offensive conduct was infrequent and isolated. Tebo does not allege that Parrot's conduct was physically threatening. Nor does she even generally allege that Parrot's alleged conduct interfered with or impacted her work performance or her opportunity to succeed in the workplace.

Furthermore, Parrot's conduct is not sufficiently severe to establish a claim for a hostile work environment. Indeed, the Eleventh Circuit has dismissed hostile work environment claims alleging significantly more serious conduct. *See, e.g., Godoy v. Habersham Cty.*, 211 F. App'x. 850, 853–54 (11th Cir. 2006) (affirming summary judgment where, *inter alia*, plaintiff endured racial slurs nearly every day, supervisor battered him, and told him "to go back to his boat and sail to South America where he belongs"); *Barrow v. Ga. Pacific Corp.*, 144 F. App'x. 54, 57 (11th Cir. 2005) (affirming

summary judgment where plaintiff's supervisor threatened to "kick [his] black ass," co-workers displayed the rebel flag, bathroom had KKK graffiti, a noose was found in a locker, and supervisors called plaintiff "nigger," "black boy," and "dumb ass.").

## II. Retaliation (Counts II and IV)

In Counts II and IV, Tebo asserts that the City took several adverse employment actions against her in retaliation for her Informal Complaint. Title VII prohibits an employer from "discriminating against any of its employees . . . because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). Whereas here, Tebo relies on circumstantial evidence to prove her retaliation claim, the *McDonnell Douglas* burden-shifting framework applies. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009).

### A. Prima Facie Case

To establish a prima facie case of retaliation, Tebo must show that: (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally related to the protected activity. *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1211 (11th Cir. 2013).

#### 1. Protected Activity

Tebo claims that she engaged in protected activity when she made an Informal Complaint on March 16, 2015. The Court agrees. It is well established that the protection afforded by the anti-retaliation provision extends not only to individuals who have filed formal complaints, but also to those who informally voice complaints to their superiors or who use internal grievance procedures. *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) (per curiam). Thus, Tebo has produced sufficient evidence to demonstrate that she engaged in protected activity.

#### 2. Adverse Employment Action

Tebo claims that after she made an Informal Complaint, the City took adverse employment action against her by: (1) removing her duties as the COR; (2) appointing Parrot as City Clerk; and (3) terminating her. (Doc. 35, p. 16 n.8). To prove adverse employment action, Tebo must show that she suffered "a serious and material change in the terms, conditions, or privileges of employment" when "viewed by a reasonable person in the circumstances." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001). [T]he asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment." *Id.*

When a change in work duties is not accompanied by any tangible harm, courts are reluctant to hold that the change amounts to an adverse employment action. *Id.* at 1244–45 (*citing Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) ("agreeing with other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes")). This is not to say that a change in work duties "can never by itself give rise to a Title VII claim; in unusual instances the change may be so substantial and material that it does indeed alter the terms, conditions, or privileges of employment. *Id.* (citation omitted).

In the instant case, Tebo has not explained how, if at all, the elimination of her COR duties (which she performed only 15% of the time)[16] constitutes an adverse employment action. She does not allege, for instance, that the elimination resulted in a significant change in employment status, pay, benefits, or other employment privileges. Nor has he suggested that the elimination substantially altered her basic job responsibilities. Thus, no jury could reasonably find that Tebo suffered an adverse employment action when her COR duties were taken away.[17]

---

[16] (*See* Doc. 35-10, p. 2).

[17] Even assuming Tebo suffered an adverse employment action, the record reveals that the City had legitimate, non-retaliatory reasons for eliminating Tebo's duties as the COR. Specifically,

Similarly, no reasonable jury could find that Tebo suffered an adverse employment action when the City took away her job title. Tebo does not argue, much less show, that the loss of her job title materially altered of the terms, conditions, or privileges of her employment. In fact, after Parrot was appointed as City Clerk, City Attorney Ardaman advised Tebo that her pay would not change and instructed her to continue performing the same duties, except for signing documents. (Doc. 29-5, p. 76). Thus, the change in Tebo's job title did not constitute an adverse employment action. *Bender v. Miami Shores Vill.*, 578 F. App'x 822, 825 n.3 (11th Cir. 2014) (concluding that an employee's "change in job title did not constitute an adverse employment action, as it did not result in a serious and material change in the terms, conditions, or privileges of her employment"); *Rhone v. U.S. Capitol Police*, 865 F. Supp. 2d 65, 69 (D.D.C. 2012) ("[r]emoval of the authority to sign documents is not a 'significant change' in employment status and does not rise to the level of an objectively tangible harm."); *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (reassignment from section chief to unit chief without reduction in pay or benefits does not constitute adverse employment action).

All that said, termination indisputably "constitutes an adverse employment action." *Rodriguez v. City of Doral*, 863 F.3d 1343, 1350 (11th Cir. 2017 (11th Cir. 1994). Therefore, the Court turns to the last element of Tebo's prima facie claim to determine whether she has produced sufficient evidence to establish causation between her protected activity and her termination.

---

Parrot testified that he removed Tebo's duties because the Mayor informed him that Tebo was inappropriately searching through emails belonging to Parrot and other Council members to find unflattering information. (Doc. 29-2, pp. 132–133). Moreover, given the anticipated action regarding Tebo's Informal Complaint, the City did not want Tebo to "have unfettered access to any confidential communication the attorney ha[d] with the counselor of the [C]ity." (*Id.*). Tebo has not offered any evidence to rebut these legitimate, non-retaliatory reasons for eliminating her COR duties.

### 3. Causation

To demonstrate a causal connection, a plaintiff must show that the decision-maker was aware of the protected activity and that the protected activity and the adverse action were not wholly unrelated. *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998). Temporal proximity can be used to show that the protected activity and the adverse [employment] action were not wholly unrelated. *McCann v. Tillman*, 526 F.3d 1370, 1376 (11th Cir. 2008) (citation omitted). But when a plaintiff relies on temporal proximity alone, the space in time between the engagement in statutorily protected activity and the retaliatory act must be "very close." *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

It is undisputed that Parrot terminated Tebo thirty-two days after receiving her Informal Complaint. Due to the close temporal proximity between Tebo's protected activity and her termination, the Court finds that the causation element is satisfied and that Tebo has established a prima facie case of retaliation with respect to her termination.[18]

### B. Legitimate Non-Discriminatory Reason for Tebo's Termination

As noted above, the City has offered several legitimate, non-retaliatory reasons for the decision to terminate Tebo—namely, for the reasons noted in the Termination Letter and the Addendum. (*See* Doc. 29-1, pp. 19–23).

---

[18] To the extent Tebo intended to assert a claim for retaliation based on her proposed 2014 Evaluation, this claim fails. Setting aside issues regarding causation, there is no indication that the proposed 2014 Evaluation had any material impact on the terms and conditions of Tebo's employment. In any event, Parrot corrected Tebo's evaluation in December 2014 and she received the highest performance ratings possible. (*See* Doc. 29-1, 4–7). The proposed 2014 Evaluation cannot reasonably be considered an adverse employment action. *Ausby v. Fla.*, 624 F. Supp. 2d 1353 (M.D. Fla. 2008) ("employee's draft lower performance evaluation, which was subsequently corrected, could not constitute an 'adverse employment action' . . . where there was no evidence of any negative impact as a result of either the draft or corrected evaluation").

Tebo does not offer any evidence of pretext. While the temporal proximity between her Informal Complaint and termination is troubling, without more, it is insufficient to establish pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1276 (11th Cir. 2017). The other evidence submitted by Tebo to prove pretext, as addressed in detail above, is either irrelevant to the pretext inquiry or insufficient to establish pretext.

## III.    Section 1983 Claim (Count V)

In Count V, Tebo has asserts a Section 1983 claim against Parrot for "unequal treatment". (Doc. 12, ¶¶ 33–39). To establish a § 1983 claim against individual defendants in their individual capacities, a plaintiff must show: (1) a violation of a constitutional right or federal statutory provision; and (2) that the violation was committed by a person acting under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999); *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1288 (11th Cir. 2001).

Tebo does not specify the statutory or constitutional grounds for her Section 1983 claim. But, based on the argument asserted in her response, it appears that she is using her Section 1983 claim as a parallel remedy to her Title VII claim. (*See* Doc. 35, pp. 19–20). When a Section 1983 is used as a parallel remedy for a violation of Title VII, the elements of the causes of action are the same. *See Cross v. State of Alabama*, 49 F.3d 1490, 1508 (11th Cir. 1995) (citing *Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982)).  Therefore, because summary judgment is warranted on Tebo's Title VII claims, summary judgment is also warranted on her Section 1983 claim.

### IV.    Conclusion

In consideration of the foregoing, it is hereby

**ORDERED** that the Motion for Summary Judgment (Doc. 29) filed by the Defendants, City of Debary, Florida and Leo Parrot, is **GRANTED**. All other pending motions are **DENIED AS MOOT**. The Clerk is directed to enter judgment in favor of the Defendants and close the file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 9, 2018.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party